(No. 33400.—

FRANCES HEIMGAERTNER *et al.,* Appellees, *vs.* BENJAMIN ELECTRIC MANUFACTURING COMPANY, Appellant.

*Opinion filed May 20, 1955—Rehearing denied September 19, 1955.*

KENNETH F. BURGESS, HOWARD P. ROBINSON, WALTER J. CUMMINGS, JR., WILLIAM K. BACHELDER, and FRANK L. BIXBY, all of Chicago, (SIDLEY, AUSTIN, BURGESS & SMITH, of counsel,) for appellant.

JACOBS, KAMIN & RATNER, of Chicago, (MOZART G. RATNER, of counsel,) for appellees.

HAROLD A. KATZ, IRVING M. FRIEDMAN, and JEROME SCHUR, all of Chicago, for Duane Patrick Greathouse *et al.*, *amici curiae;* DANIEL D. CARMELL, of Chicago, for Illinois State Federation of Labor, *amicus curiae.*

Mr. JUSTICE DAILY delivered the opinion of the court:

This appeal from the circuit court of Cook County presents the question of the constitutional sufficiency of section 17-15 of the Illinois Election Code, (Ill. Rev. Stat. 1951, chap. 46, par. 17-15,) which falls within the category of what is sometimes described as "pay-while-voting" legislation. Specifically, the terms of the statute are as follows: "Any person entitled to vote at a general or special election or at any election at which propositions are submitted to a popular vote in this State, shall, on the day

of such election, be entitled to absent himself from any services or employment in which he is then engaged or employed, for a period of two hours between the time of opening and closing the polls; and such voter shall not because of so absenting himself be liable to any penalty, nor shall any deduction be made on account of such absence from his usual salary or wages; Provided, however, that application for such leave of absence shall be made prior to the day of election. The employer may specify the hours during which said employee may absent himself as aforesaid. Any person or corporation who shall refuse to an employee the privilege hereby conferred, or shall subject an employee to a penalty or deduction of wages because of the exercise of such privilege, or who shall directly or indirectly violate the provisions of this section, shall be deemed guilty of a misdemeanor and be fined in any sum not less than fifty dollars ($50) nor more than three hundred dollars ($300)."

The facts which bring the validity of the statute into question at this time show that plaintiffs, forty-nine in all, were employed at an hourly wage rate by defendant, the Benjamin Electric Manufacturing Company, an Illinois corporation. Prior to the general election of November 4, 1952, each of the plaintiffs requested and was granted a leave of absence for the purpose of voting. On the day in question the polls were open from 6:00 A.M. until 5:00 P.M., whereas the plaintiffs' work schedule was from 8:00 A.M. to 4:30 P.M., and it is stipulated in the record that all of the plaintiffs could have cast their ballots between 6:00 A.M. and 8:00 A.M. without interfering with their scheduled work with the defendant. Instead, however, all chose to vote during the period of absence authorized and it is agreed that each did actually use the time to vote. Thereafter, the defendant paid plaintiffs for the actual hours worked on November 4, but refused to pay for the time they were absent. Although an employer-

union collective bargaining agreement was in existence at the time, it made no reference to the problem.

As a consequence of defendant's refusal to pay for the time of authorized absence, plaintiffs filed this action, based upon the quoted section of the Election Code, to recover the wages they would have earned had they not taken the time off to vote. It should be noted now, to quiet a contention of appellant, that although the act is penal in nature, that in itself does not bar a civil remedy. When a statute is enacted for the protection of a particular class of individuals, a violation of its terms may result in civil as well as criminal liability, even though the former remedy is not specifically mentioned therein. *Streeter* v. *Western Wheeled Scraper Co.* 254 Ill. 244; *Sloan* v. *F. W. Woolworth Co.* 193 Ill. App. 620; *Ballarini* v. *Schlage Lock Co.* 100 Cal. App. 2d Supp. 859, 226 Pac. 2d 771; *State* v. *International Harvester Co.* 63 N.W. 2d (Minn.) 547; *Olesen* v. *Retzlaff,* 184 Minn. 624, 238 N.W. 12; 1 C.J.S. Actions, sec. 9; Rest. Torts, vol. 2, sec. 286.

In defense to the plaintiffs' complaint, the defendant alleged that section 17-15, insofar as it requires payment of wages for the period of unauthorized absence, is unconstitutional in that it deprives an employer of property without due process of law, denies an employer equal protection of the laws, grants employees a special privilege, and abridges the right to contract. After hearing the cause on a stipulation of facts, the trial court entered judgment for the plaintiffs. Since constitutional issues are fairly involved, appeal has been taken directly to this court.

This is not the first time we have been called upon to consider the validity of pay-while-voting legislation. In *People* v. *Chicago, Milwaukee and St. Paul Railway Co.* 306 Ill. 486, a decision rendered in 1923, the defendant corporation was adjudged a misdemeanant for having failed to pay an employee for two hours time spent in voting, in violation of section 25 of an act relating to the manner

of holding elections, enacted in 1908. (Laws of 1907-1908, p. 80.) Except for differences in penalties, the 1908 statute was couched in terms identical with the existing provision of the Election Code which was adopted in 1943. (Laws of 1943, vol. 2, p. 1.) On appeal, this court reversed the conviction holding that while a period of absence for voting could validly be authorized, the provision which required the employer to pay an employee for such time could not be sustained as a valid exercise of the police power in that it deprived the employer of its property without due process of law, denied equal protection of the laws, and was an unreasonable abridgement of the right to contract.

The parties to the present action have argued extensively here as to the relative effects of our former decision and of the subsequent action of the legislature in reenacting the pay-while-voting regulation from time to time. It is our opinion, however, that a determination of the questions raised by such contentions is unnecessary at this time. In light of the apparent resurgence of this type legislation and the divergent judicial opinion it has provoked in recent years, together with plaintiffs' assertion, apparently indulged in by the trial court, that the evolution of an expanding police power should now serve to alter the previous views of this court, we think it is incumbent upon us to now re-examine the problem in its entirety. Indeed, in *Zelney* v. *Murphy*, 387 Ill. 492, (1944,) where the analogies of the pay-while-voting statute were being discussed, this court said (p. 498) : "The growing complexity of our economic interests has inevitably led to an increased use of regulatory measures in order to protect the individual so that the public good is reassured by safeguarding the economic structure upon which the good of all depends."

Plaintiffs have cited to us and quoted extensively from several cases of recent origin which, it is claimed, reject the constitutional objections this court found to the pay-

while-voting regulation. Foremost among them, and the only one which has been reviewed by the Supreme Court of the United States, is *State* v. *Day-Brite Lighting, Inc.,* 362 Mo. 299, 240 S.W. 2d 886 (1951), affirmed 342 U.S. 421, 96 L. ed 469. In that case the defendant corporation was found guilty of both refusing to permit an employee to absent himself for a four-hour period in which to vote, and of refusing to pay him his hourly wage for the period he did in fact absent himself for such purpose. Upon appeal to the Missouri Supreme Court, the conviction was affirmed by a court sharply divided on the issue of whether the pay provision of the Missouri statute was a constitutional exercise of the State's police power. The majority, making but little effort to distinguish between the authorized absence and pay features of the statute, held that it was a valid exercise, reasoning that the protection of the political welfare of its citizens was as important as the protection of their economical and physical well-being. In holding that the regulation was not so arbitrary, unreasonable or discriminatory as to violate their constitutional requirements of due process, equal protection and freedom of contract, the court stated that it was a reasonable classification of the employer-employee relationship comparable to minimum wage legislation, necessary and proper for the public welfare, which imposed an economic burden on the employer that was relatively slight when compared with the public interest to be subserved. The minority of the court, distinguishing between the authorized absence provision and the pay provision, was of the opinion that there was no valid need for the latter, sufficient to justify the overriding of the constitutional guarantees.

Upon further appeal of the *Day-Brite case,* the Supreme Court of the United States, in an opinion described by one writer as casting "a withering ray upon Constitutional protection," (47 Northwestern Law Review, 252, 254,) refused to weigh the wisdom of such legislation or to

decide whether the policy it expresses offends the public welfare, but found the Missouri statute valid as an exercise of the police power in the form of a minimum wage regulation and, as such, free of infirmity under the Federal constitution. Again, it remained for a dissenting justice to distinguish between absence for voting and pay for voting and to point out that the latter transcends mere regulation of practices in the business-labor field. Although the decision eliminates the Federal aspects of the problems surrounding such regulations, it serves to reaffirm that it is for each State to determine if its legislature is empowered to enact such a statute and to determine if the means selected to further the public welfare bear a real and substantial relation to the objects sought to be obtained. It is the duty of each State to pass upon the validity of its own legislation and, if no Federal question is involved, the United States Supreme Court will adopt and follow the decision of the State court. *Fairfield* v. *Gallatin County,* 100 U.S. 47, 25 L. ed. 544; 11 Am. Juris. Constitutional Law, sec. 109.

It has been aptly stated that the basic problem underlying the pay-while-voting regulations is how far the State may go in the exercise of its police power, and its corollary, to what extent will the constitution protect individual rights. Section 2 of article II of the Illinois constitution prevents the taking of private property without due process of law and also has been construed to guarantee the equal protection of our laws. (*People* v. *Lloyd,* 304 Ill. 23; *Marallis* v. *City of Chicago,* 349 Ill. 422.) These rights, however, are not absolute. The State may, in the exercise of its police power, restrict, regulate or prohibit any and all uses of private property in the interest of public health, safety and welfare. (*Midland Electric Coal Corp.* v. *County of Knox,* 1 Ill. 2d 200; *People* v. *Weiner,* 271 Ill. 74.) The police power, however, while paramount to the rights of the individual, is still restrained by the fundamental prin-

ciples of justice connoted by the phrase, due process of law. As stated in our previous pay-while-voting decision, the police power cannot override the natural demands of justice, nor disregard the constitutional guarantees in respect to the taking of private property, due process and equal protection of the laws. This implies action not merely arbitrary, but having a relation to the health, safety, morals or general welfare of the public. Although it is for the legislature to determine when to act in the public interest, it is for the courts to ascertain if the exercise is a proper one. We have consistently stated that the standard of a proper exercise of the police power is whether the statute is reasonably designed to remedy the evils which the legislature has determined to be a threat to the public health, safety and general welfare. *Vissering Mercantile Co.* v. *Annunzio,* 1 Ill. 2d 108; *Stewart* v. *Brady,* 300 Ill. 425; *City of Belleville* v. *St. Clair County Turnpike Co.* 234 Ill. 428.

In enacting section 17-15 of the Election Code in 1943, the legislature sought to increase election participation, undoubtedly a high and benevolent public purpose under our representative form of government. Assuming the existence of the problem, and there is no showing here to the contrary, the mere finding that it does exist does not permit arbitrary or unrelated means of meeting it to be adopted. (*Schroeder* v. *Binks,* 415 Ill. 192.) The relationship and reasonableness of the provision which permits each eligible voter to absent himself from his employment on election days has not, to our knowledge, ever been seriously questioned even though such absence might in itself cause substantial inconvenience and loss to an employer. Indeed, it is not questioned on this appeal. However, the further provision of the section which ordains that no deductions shall be made from any wages or salaries because of such absence, is not so easily justified. Whether pay-while-voting bears a real and substantial relation to

getting out the vote is a matter of debate. In fact this was recognized by the dissenting justice in the *Day-Brite case,* who pointed out that a requirement to pay time-and-a-half, or double time, would do even better in swelling the vote. Whatever the relationship, however, we are of the opinion that the provision is a questionable means of attaining the desired end, and are in accord with the dissenting justice that "to shift the whole voting burden from the voter to someone else who happens to stand in an economic relationship to him" is neither just nor reasonable.

Looking first to the mechanics of the statute, it is to be noted that actual voting is not a prerequisite to payment, for although the employee is granted a leave of absence, he is under no duty whatsoever to vote. Whether any public benefit is derived from such a provision depends upon each employee's good conscience and realization of civic duty. This is the same sense of duty which is still deemed sufficient to cause the housewife, the farmer, the shopkeeper or other self-employed persons to exercise their right of suffrage. Be that as it may, it should be observed, too, that no group in our time has a finer record of election interest and participation than does labor, making it difficult to conceive that the employee now needs an added incentive to perform his obligations as a citizen. In any event, whether the provision in question will achieve the desired result remains so questionable as to cast doubt upon its validity as an exercise of the police power.

Nor do we find that the regulation has any real or substantial relation to the object sought to be obtained. Even though the cost to the employer has been substantial, this court has sustained, as a proper exercise of the police power, legislation dealing with maximum hours, minimum wages, workmen's compensation, unemployment compensation, and the like. (See: *Vissering Mercantile Co.* v. *Annunzio,* 1 Ill. 2d 108, 112; *Zelney* v. *Murphy,* 387 Ill. 492.) In those instances it was necessary to remedy an evil which

had arisen from or become incident to the employer-employee relationship and the validity of the legislation was sustained as a regulation of the master-servant relationship. Conversely, we have stricken down regulations made under the guise of police power which could not reasonably be said to arise from such relationship, the most recent occasion being in *Grasse* v. *Dealer's Transport Co.* 412 Ill. 179, where we held section 29 of the Workmen's Compensation Act as invalid exercise of the police power insofar as it took away the employee's right of action against a tort-feasor.

In the present case, we find no justification for a view that the problem of decreased election participation has arisen from the master-servant relation. It is not the business or responsibility of the employer to get out the vote, nor does the individual right of suffrage in any manner stem from the employment relation. Undoubtedly, history reflects the one-time necessity of voting regulations for the purpose of safeguarding the right of suffrage against employer coercion. We think, however, at least in this jurisdiction, that such a purpose has become outmoded by modern means of transportation, increased voting hours, shorter working hours, and other contemporary labor developments. Additionally, we find no compelling similarity in pay-while-voting to minimum-wage legislation. As many critics of the legislation have pointed out, it would be distinction enough that under the voting statute an employee is being paid for not working. We should consider too, at this point, that as a direct result of minimum wage legislation, the standard of living of the employee is increased and the labor market is enlarged, thus reducing the burden of public assistance and the problem of public health, to the benefit of employer and employee alike. On the other hand the only direct result of the pay-while-voting legislation is that the employer loses wages and production, and the employee may or may not vote. (See: 47 North-

western Law Review, 252, 255.) It is our conclusion that the regulation has no real or substantial relation to the object of public welfare sought to be attained and thus may not be sustained as a constitutional exercise of the police power.

The Court of Appeals of Kentucky, in striking down a similar pay-while-voting regulation in *Illinois Central Railroad Co.* v. *Commonwealth,* 204 S.W. 2d 973 (1947), made the following observation (p. 975): "The law will not countenance a public maintenance of a private, enterprise. Neither should the law demand a private maintenance of a public enterprise. Voting is a public enterprise. But if its maintenance is required by the employer group rather than by the entire, broad, general public, then that amounts to a requirement of private maintenance of a public enterprise." This court has recognized the same principle in *Midland Electric Coal Corp.* v. *County of Knox,* 1 Ill. 2d 200, and *Ohio and Mississippi Railway Co.* v. *Lackey,* 78 Ill. 55, where it was pointed out that burdens created in the public interest should be borne by the public rather than by private interests. We think it has application here, for, by the voting regulation, one class of society, the employer, whether great or small, must subsidize another, though the payor may be in no better position to pay the extra cost of good citizenship. (See: 66 Harvard Law Review, 89.) Such a condition falls within the admonishing words of Mr. Justice Holmes in *Pennsylvania Coal Co.* v. *Mahon,* 260 U.S. 393, 415-416; 67 L. ed. 322, 326, that "a strong public desire to improve the public condition does not warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." Inasmuch as we are concerned here with a public problem and a public burden, as distinguished from a problem created by the master-servant relationship, it is our opinion that the regulation is both unreasonable and discriminatory

in shifting the burden of subsidizing voters solely upon employers of labor.

As was true in this court's previous consideration of the disputed statute, we also find significance in the contention that the disputed portion of the statute creates arbitrary classifications. Section 22 of article IV of the constitution of 1870 requires that a legislative classification of persons subject to a statute must rest on some difference which has a reasonable and just relation to the act in respect to which the classification is proposed, otherwise it will be deemed arbitrary and in violation of the constitutional guaranties of due process and equal protection of the laws. (*Larvenette* v. *Elliott*, 412 Ill. 523; *Ronda Realty Corp.* v. *Lawton*, 414 Ill. 313.) The regulation in question creates a classification of voters who are paid either wages or salaries as distinguished from the pieceworker, the salesman, the self-employed, and those who work for fees or commissions. There is no indication that wage-earners have been any more lax in voting than any one else and there is no showing that they find it more difficult to find the polls open at a convenient time than has the farmer, the housewife, or others who work during the day. Yet, despite the fact no difference of situation has been shown to exist, it is only the one class of voters which the statute singles out to be paid for voting. The most arbitrary classification is that of those who are chosen to pay this arbitrary class of voters. The selection of payors is not related to anything connected with voting but rests solely on a chance economic relationship. Such a regulation, which applies to some cases and does not apply to other cases not essentially different in kind, cannot be sustained. This was the view of Justice Jackson in his dissenting opinion in the *Day-Brite case*, when he said: "The discriminatory character of this statute is flagrant. It is obvious that not everybody will be paid for voting

and the 'rational basis' on which the State has ordered that some be paid while others are not eludes me. If there is a need for a subsidy to get out the vote, no reason is apparent to me why it should go to one who lives 200 feet from his polling place but not to a self-employed farmer who may have to lay down his work and let his equipment idle for several hours while he travels several miles over bad fall roads to do his duty as a citizen. If he has a hired man, he must also lose his hand's time and his pay. Perhaps some plan will be forthcoming to pay the farmer by requiring his mortgagee to rebate some proportion of the interest on the farm mortgage if he will vote. It would not differ in principle. But no way occurs to me by which the doctor can charge some patient or the lawyer some client for the call he could not receive while he was voting." 342 U.S. 421, 427, 96 L. ed. 474.

The numerous other authorities cited to us in the plaintiffs' behalf do not, as we construe them, have a persuasive application to the constitutional issues with which we are faced. In *People* v. *Ford Motor Co.* 63 N.Y.S. 2d 697, the criminal provisions of a similar voting statute were held valid, with little discussion of their constitutional justification. Although the majority opinion stated: "To justify the state in interposing its authority in behalf of the public, in exercise of police power, it must appear that interests of the public generally, as distinguished from those of a particular class, require such interference," it was left for the dissenting judge to point out that the pay-for-voting provision benefits, not the general public, but only a select few.

An *amicus curiae* herein has called our attention to the recent case of *Lorentzen* v. *Deere Manufacturing Co.* 66 N.W. 2d (Iowa) 499, in which the Supreme Court of Iowa allowed employees to recover wages for the time spent in voting. This decision was based, however, upon an interpretation of the statute itself. The employer had

contended, and the trial court so held, that an employee was not entitled to time off if he could have voted either before or after work. In reversing this decision, the Supreme Court held that employees must be allowed a leave of absence from their employment regardless of their other opportunities to vote. Whether or not the pay-for-voting provision was constitutional was never considered. As the court said: "The question of possible unconstitutionality of Section 49.109 is suggested, but not argued by the appellee. * * * It is true it is later urged that a holding interpreting the statute favorably to plaintiffs would make it unconstitutional, but we are not told why this would be so, what particular provisions of the basic law of the federal or state governments would be transgressed, or what authorities so hold. * * * In view of the strong presumption of validity of the law and the failure of defendant-appellee to point out in argument wherein it offends against the provisions of either constitution or to cite sustaining authorities, we decline to pass upon the constitutional aspects of the statute." Whether or not the court would have reached the same decision had the constitutional question been presented is left further in doubt by its subsequent language: "It may be remarked in passing that it may be still more debatable to pay the voter for voting. Under modern economic conditions, in Iowa at least the great majority of workers have ample time outside their working hours in which to reach the polls and cast their ballots. So the two hour period taken from their time of service becomes a reward for performing a civic duty which every citizen should be glad to perform without pay. It becomes a bonus, a 'windfall'." The case is clearly not in point.

It is true that a California appellate court, in *Ballarini* v. *Schlage Lock Co.* 100 Cal. App. 859, 226 Pac 2d 771, has also held contrary to our prior decision. On the other hand, Kentucky's highest court has declared a similar pro-

vision to be unconstitutional. (*Illinois Central Railroad Co. v. Commonwealth*, 204 S.W. 2d (Ky.) 973.) We think the conflict in decisions on the issue serves only to point up the observation contained in 16 C.J.S. Constitutional Law, sec. 568, that what due process requires in one State is not necessarily due process in another.

Finally, plaintiffs contend that social and economic conditions have changed to such an extent since 1923, that we are now bound to reach a contrary result in this matter. No one will deny that times have changed, but whether the changes justify a decision that an attempted exercise of the police power which was once unconstitutional has now become constitutional is another matter. Pay-while-voting statutes were originally conceived in the period of working days which ranged from twelve to sixteen hours and reflect upon a time when transportation facilities were both slow and meager. In the years that have passed, the working period has been reduced to the point where most employees work eight or less hours a day. Modern transportation facilities now permit travel to and from work in the matter of minutes. Further, labor unions, then in their infancy, now guarantee an employee equal bargaining power with his employer. All of these factors have served to diminish the need for regulation, and to divorce the problem of not voting from the master-servant relationship. If it is still deemed a necessary incentive that employees be paid for voting, we think it is matter to be settled by private agreement rather than by penal legislation which burdens and benefits but a few of those in the community who are affected.

Time, we believe, has served only to strengthen the logic in our earlier opinion. Since that date, the legislature has made no attempt to alter the provision or to reconcile it to our result. In fact, it is not until now, approximately thirty years later, that it has been questioned. Such a decision cannot be lightly ignored. Although the doctrine of

*stare decisis* is not inviolable, our judicial system demands that it be overturned only on the showing of good cause. We are of the opinion that such has not been shown in this case.

For the reasons stated, we reaffirm *People* v. *Chicago, Milwaukee and St. Paul Railway Co.* 306 Ill. 486, and continue to hold that insofar as section 17-15 of the Election Code (Ill. Rev. Stat. 1953, chap. 46, par. 17-15,) requires an employer to pay salary or wages for the released time for voting, it is subject to the constitutional infirmities expressed in that opinion. The judgment of the circuit court of Cook County is therefore reversed.

*Judgment reversed.*