(No. 42523.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.* JAMES TATE, a/k/a ANTHONY BUTLER, Appellant.

*Opinion filed June 29, 1970.*

GERALD W. GETTY, Public Defender, of Chicago, (GEORGE L. LINCOLN and JAMES J. DOHERTY, of counsel,) for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and EDWARD V. HANRAHAN, State's Attorney, of Chicago, (JAMES B. ZAGEL, Assistant Attorney General, and ELMER C. KISSANE and JOSEPH ROMANO, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE KLUCZYNSKI delivered the opinion of the court:

After a jury trial in the circuit court of Cook County, James Tate, otherwise called Anthony Butler, was convicted of the crime of theft of an automobile having a value in excess of $150 and sentenced to the penitentiary for a term of from three to nine years. He appeals that conviction claiming that error was committed when certain statements were admitted in evidence in disregard of *Miranda* v. *Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602; that the prosecutor improperly commented on his failure to testify; and that the State failed to prove that the automobile was taken without the consent of the owner.

Defendant's claimed violation of his *"Miranda"* rights occurred at the time of his arrest, the details of which were admitted into evidence. On October 6, 1968, at a point just west of Rockford, State troopers Pratt and Morse observed a 1965 green Mercury automobile, license number HN 1315, traveling in an erratic manner and at an excessive rate of speed. They followed the car for some distance during which time they radioed for a license registration check. They were notified that the license plates had been issued to Willie Amerine for use on a 1961 Chevrolet. The officers then stopped the car and asked defendant Tate to identify

himself. He replied that his name was Etheon Smith and produced a Chicago traffic ticket bearing that name. Both officers testified that at that time they did not know the car was stolen. Officer Pratt then questioned defendant regarding the discrepancy in license registration. Tate stated that the license plates belonged on the car. Pratt then advised defendant that he knew the license plates were registered to Willie Amerine for a 1961 Chevrolet. Tate replied: "Well, you are right. The plates don't belong on the car." The officers then took Tate to the squad car and placed him under arrest for improper use of registration. The police at that time intended to take Tate to the county jail to post bond. The officer explained that if defendant had had a valid driver's license on his person he, Tate, could have posted that in lieu of bond and avoided being taken into custody.

Officer Pratt then went back to the Mercury automobile. As he passed the rear of the vehicle he noticed a hole where the trunk lock had been. He then copied down the vehicle serial number and radioed for a determination of whether the car was stolen. Officer Pratt then moved the car from where it had been stopped (a deceleration lane on a main highway) to a neighboring side road. After he parked the vehicle, he requested that defendant turn off the ignition and lock the car to his satisfaction. When Tate attempted to still the engine by means of the ignition key, nothing happened. Tate then reached beneath the dashboard and the engine ceased running. One of the officers then looked beneath the dashboard and found that the ignition switch had been bypassed. The vehicle was then locked and defendant taken to the county jail. It was later learned that the vehicle had been stolen in Chicago. Both officers testified that they first suspected the car was stolen when they saw that the ignition switch had been bypassed. There is no indication in the record that defendant was at any time given the fourfold *Miranda* warnings.

Tate argues that "[f]rom the high speed and suspicious

movements of the car, as well as the switched license plates, * * * the officers were justified in arresting [him]. But, after they arrested him, they were bound to inform him of his rights before his statements would be admissible. Since his statements were made in response to questioning, while he was in custody, they fall directly within the" scope of *Miranda* v. *Arizona.*

The essential question before this court is whether, at the time defendant uttered the "explanatory" statements, he was "in custody" or merely detained consistent with proper police investigatory procedure.

In *Miranda,* the United States Supreme Court held that: "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (384 U.S. at 444, 16 L. Ed. 2d at 706.) The court also noted that its decision was "not intended to hamper the traditional function of police officers in investigating crime. * * * General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present." 384 U.S. at 477-478, 16 L. Ed. 2d at 725, 726.

Analyzing the factual setting of the case at bar within the context of *Miranda's* import, we find no error. Here, the State troopers were properly pursuing legitimate police investigatory procedures. The first time the officers had any suspicion that the car had been stolen was when they ob-

served the damaged condition of the trunk lock. This occurred after defendant had made the damaging statements. Defendant was stopped because of his erratic and high speed driving and because of the discrepancy in registration. The police questioning was merely to obtain information regarding whether, in fact, a registration violation had occurred. Improper registration of vehicles by owners is certainly not an uncommon occurrence, as the facts of this case show; the registration of this car by the owner was faulty. Defendant was taken into custody because he did not have a valid operator's license to post as bond for the improper registration violation. And, it was only after defendant was in custody that the police first suspected the car might have been stolen. We feel that the detention here described was merely investigatory and not "custodial" in nature and, as such, did not require the giving of the *Miranda* warnings. See *United States* v. *Lowe* (9th cir. 1969), 407 F.2d 1391; *United States* v. *Chadwick,* (10th cir. 1969), 415 F.2d 167.

It is next argued that the prosecutor made improper remarks regarding defendant's failure to testify. In his closing argument to the jury, the prosecutor informed them that they would be instructed that possession of recently stolen property, if not explained, is sufficient to raise the inference that the defendant obtained the property by theft. He continued: "The testimony of the police officers is uncontradicted. In fact, all our evidence is uncontradicted in the record. The only evidence we have here is that he was driving that car down the highway on October 6, with a hot ignition, Mr. Amerine's plates on it, with the trunk lock popped out, with the phony key in the ignition. He used a phony name to the police, tried to conceal his identity, and said that it was his car. In fact, it was not. * * * He did not explain how he got that car." The defense objected to the prosecutor's statement as being a comment on the defendant's failure to testify. At a conference out of the

presence of the jury, the State's Attorney explained that his comment was inadvertent, and that he would tell the jury that there were other ways for the defense to explain the possession. The court then allowed the prosecutor an opportunity to clarify his remarks. In so doing, the prosecutor stated to the jury: "Now, as I was saying, the principle of recent unexplained possession makes it incumbent upon the defense to come forward and explain why and how that possession came about." The defense objected claiming that the State was attempting to shift the burden of proof. However, the court overruled the objection. The State's Attorney continued: "The rule is thatt hey have to offer an explanation or this rule of law inures against him. No such explanation was brought forward. And this in no way means, nor does it put any burden on the defendant to himself to testify. This is not what we contend. He has his right not to testify and this can in no way be used against him, and we do not ask that. But there are other ways it could be explained. It could be explained by bringing in people, other witnesses who saw how he came in possession of this vehicle." We believe that when the prosecutor's comments are read as a whole, no reversible erro is shown. The prosecutor made clear to the jury that no unfavorable inference was to be drawn simply because the defendant did not testify in his own behalf. Accordingly, any improper comment on defendant's failure to testify was promptly cured. And his comment that it was "incumbent" on the defense to offer an explanation of the possession "or this rule of law inures against him" was not such error as would require reversal. Although it is true that when read by itself the statement might give the impression that the defense had the burden of coming forward with evidence or the presumption would mandatorily apply, we are convinced beyond a reasonable doubt (*cf. Chapman* v. *California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824) that when read in the context

of this entire record any error occasioned by this fleeting statement was harmless. The jury was correctly instructed that the State had the burden of proving defendant guilty beyond a reasonable doubt; that the burden remained on the State throughout the case; and that the defendant was not required to prove his innocence. (IPI Criminal 2.03, given.) Further, the jury was instructed: "If you find that the defendant had exclusive possession of recently stolen property, and there was no reasonable explanation of his possession, you may infer that defendant obtained possession of the property by theft by exerting unauthorized control." (IPI Criminal 13.21.) Accordingly, the jury was apprised of the proper application of this presumption in relation to the State's burden of proof; *i.e.*, the onus was on the State to prove defendant guilty beyond a reasonable doubt and they, the jury, could reach the suggested conclusion that from his unexplained possession of recently stolen goods defendant was guilty of theft, but were not, as a matter of law, required to do so. See E. Cleary, Handbook of Illinois Evidence 61, 2d ed. 1963; 9 Wigmore on Evidence 417, sec. 2513, 3d ed. 1940.

Furthermore, the evidence against defendant was so overwhelming that we have no doubt that the prosecutor's untoward comment had no effect on the jury's verdict. Not only do the facts surrounding defendant's arrest militate strongly against his innocence, but the record reveals other facts equally damaging. After thoroughly reviewing the record, we find no error.

Finally, it is argued that the State failed to prove that the automobile was taken without the owner's consent. We find no merit to this contention. Mrs. Anna Amerine testified that the automobile belonged to both her and her husband although the car was registered in her husband's name alone. She further testified that she filed a stolen car report with the police on the day the car was discovered

missing. Accordingly, we feel there was sufficient proof that the car was taken without the owner's consent.

The judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*