THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JOSEPH RODRIGUEZ, Defendant-Appellant.

First District (5th Division) No. 83—0056

Opinion filed May 24, 1985.—Supplemental opinion filed on denial of rehear-
ing August 2, 1985.

James J. Doherty, Public Defender, of Chicago (John Lanahan, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Jeanette Sublett, and John J. Muldoon III, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, defendant Joseph Rodriguez was convicted of two counts of murder (Ill. Rev. Stat. 1981, ch. 38, par. 9—1), and was sentenced to natural life in prison. He contends on appeal that a suggestive in-court identification by a witness and improper comments by the prosecutors deprived him of a fair trial. He also con-

tends that the imposition of a natural life sentence upon a minor violates the United States and Illinois constitutions. Our disposition is based on the following facts.

Renaldo Hernandez testified that he had known defendant for years and that he and defendant were members of the Kool Gang. In 1981, a dispute arose between the Kool Gang and another southwest side street gang, the Villalobos. According to Hernandez, his gang believed that Charles Palmer, a member of the Villalobos, had a Kool Gang jersey. Defendant discussed the jersey with Charles Palmer several times during the summer and fall of 1981.

On December 12, 1981, defendant and Hernandez observed Joey and Theresa Palmer walking homeward; they mistook Joey for his brother, Charles. Defendant asked Hernandez if he wanted to kill them, and Hernandez responded that it was up to defendant. Hernandez went home for a gun. which he said he had been holding for defendant. Defendant took the gun and positioned himself in hiding along Joey and Theresa's route. As Joey and Theresa passed him, defendant crossed the street, then sneaked up behind the two, raised the gun, and shot Joey in the back of the head. Theresa began screaming and defendant shot her twice, turned to run, then shot her a third time. Hernandez testified that he and defendant ran away, separated, and hid.

On cross-examination, Hernandez admitted that he had lied in a previous statement to an assistant State's Attorney and in his testimony before the grand jury. After his attorney advised him that he could be sentenced to a term of natural life in prison, Hernandez struck a deal: he would testify against defendant and plead guilty to obstructing justice in exchange for the State's Attorney's recommendation that he be sentenced to four years' imprisonment.

Theresa Santana testified that she lived across Halsted Street from the victims, and that she had known defendant for several years. Santana was descending a stairway outside her residence in the evening hours of December 12, 1981, when she saw Joey and Theresa Palmer walking home. She recognized defendant as he crossed Halsted Street toward her, but before she could greet him, he turned and jogged at an angle back across the street. Santana testified that defendant unzipped his jacket, pulled a gun, shot Joey once or twice and shot Theresa two or three times. She said that defendant then ran away.

Santana stated that she spoke to the police on the evening of the shooting and gave them a description, but she did not name defendant. The next day, the police showed her some photos, including a

photo of defendant, but she again failed to identify him. Finally, two days after the incident, Santana identified defendant from a high school yearbook picture. She explained that she did not identify him earlier because she was afraid that his gang would retaliate; she stayed inside her house for three or four weeks after the shooting. On cross-examination, Santana admitted that she spoke with private investigator Robert Beseth on December 19, 1981. She said that Beseth never showed her any written statement, and she generally denied making the statements which defense counsel's questions attributed to her.

Danny O'Neal Morris testified that he was sitting near a window in his second-floor apartment at about 5:45 p.m. on December 12, 1981, when he heard four gunshots. He looked out the window, which overlooks an alley adjoining Halsted Street, and saw two men run through the alley. Morris said that he did not see the first man's face, but the man was 5 foot 8 inches, 160 pounds, with a medium complexion, an "afro" hairstyle and a brown jacket. He described the second man as a 5 feet 6 inches Latino, 135 pounds, with black hair parted in the middle, a black leather jacket, and a gun. Morris testified that he saw the second man's face for a few seconds, and he positively identified defendant as that man. Over defendant's objection, Morris identified defendant in a lineup photograph as well as in open court, although he had not attended the lineup nor made any pretrial identification.

The victims' mother testified that she heard shots and went downstairs to discover her daughter, bleeding and motionless, and her son, still conscious, not knowing what had happened. Charles Palmer, the victims' brother, substantially corroborated Hernandez' testimony concerning the dispute between the gangs. In addition, police officers described various stages of the investigation, and a pathologist opined that the victims died from bullet wounds.

Private investigator Robert Beseth testified for the defense. He said that on December 19, 1981, he spoke with Theresa Santana at her home. She told him that she did not initially identify defendant for three reasons: his hairstyle was not the same as she remembered, he did not have bags under his eyes as she remembered, and she was afraid. Beseth stated that he wrote a report of the interview immediately afterward, had the report typed two days later and asked Santana to sign it, but she declined, saying that the police and her parents told her not to sign anything.

During closing arguments, Assistant State's Attorney Timothy McMahon argued that Theresa Santana was understandably reticent

to identify defendant, and he remarked that "after the police and her mother and her relatives reassure her not to be afraid, you will be protected, she tells the police [defendant's name]." Defense counsel responded that this comment was not supported by the evidence. In rebuttal, Assistant State's Attorney Brian Telander stated, "[A]s long as he brought it up, I'll tell you. Three weeks after this, we had to move her to Texas." The trial court overruled defense counsel's objection. Telander continued, "Do you think she enjoyed testifying against gang members? Do you think she enjoyed not going to school and leaving town? You know that's not true." The prosecutors also advised the jury that defense counsel's responsibility was "to try to get his client off," and that defense counsel lied in his argument. The prosecution attempted to minimize the impact of the deal with Hernandez, stating that he was "not guilty of murder."

Following deliberations, the jury returned verdicts of guilty on two counts of murder. The trial court entered judgment on the verdicts and sentenced defendant to natural life in prison. Defendant filed a timely notice of appeal.

OPINION

Defendant first contends that the trial court improperly permitted Danny O'Neal Morris to identify defendant from a photograph of a lineup which Morris never attended. Because he was conspicuously seated at the defense table, defendant reasons, the identification procedure was so suggestive as to deprive him of a fair trial. Defendant relies upon *Moore v. Illinois* (1977), 434 U.S. 220, 54 L. Ed. 2d 424, 98 S. Ct. 458, and *Foster v. California* (1969), 394 U.S. 440, 22 L. Ed. 2d 402, 89 S. Ct. 1127.

*Foster* involved a series of suggestive pretrial confrontations during which the eyewitness progressed from "not sure" to "convinced" of his identification. (394 U.S. 440, 441-42, 22 L. Ed 2d 402, 405-06, 89 S. Ct. 1127, 1127-28.) The *Foster* court stated that the suggestiveness of the procedure "made it all but inevitable" that the victim would identify the accused, and held that the procedure was so unreliable as to violate due process. (394 U.S. 440, 443, 22 L. Ed. 2d 402, 407, 89 S. Ct. 1127, 1129.) Recognizing that the reliability of an eyewitness identification is ordinarily a matter for the jury, the *Foster* court reiterated that such evidence must be excluded where procedures are so unnecessarily suggestive as to give rise to a substantial likelihood of irreparable mistaken identification. 394 U.S. 440, 442, 22 L. Ed. 2d 402, 406, 89 S. Ct. 1127, 1128. See *Simmons v. United States* (1968), 390 U.S. 377, 384, 19 L. Ed. 2d 1247, 1253, 88 S. Ct. 967, 971.

*Moore* involved a one-on-one confrontation between the victim and the accused at a preliminary hearing. The *Moore* court emphasized the inherent dangers of suggestive pretrial identification procedures:

" '[T]he first line of defense must be the prevention of unfairness and the lessening of the hazards of eyewitness identification at the lineup itself. The trial which might determine the accused's fate may well not be that in the courtroom but that at the pretrial confrontation, with the State aligned against the accused, the witness the sole jury, and the accused unprotected against the overreaching, intentional or unintentional, and with little or no effective appeal from the judgment there rendered by the witness—"that's the man." ' " *Moore v. Illinois* (1977), 434 U.S. 220, 225, 54 L. Ed. 2d 424, 431, 98 S. Ct. 458, 463, quoting *United States v. Wade* (1967), 388 U.S. 218, 235-36, 18 L. Ed. 2d 1149, 1162-63, 87 S. Ct. 1926, 1936-37.

The court noted that if the accused had been represented by counsel, counsel could have requested a less suggestive lineup, he could have asked the victim to attempt an identification while the accused sat in the audience, and he could have cross-examined the victim to test the identification before it became certain. (434 U.S. 220, 230 n.5, 54 L. Ed. 2d 424, 435 n.5, 98 S. Ct. 458, 465-66 n.5.) The *Moore* court stated that some or all of the suggestiveness could have been avoided and held that the preliminary hearing showup procedure violated the accused's right to counsel. 434 U.S. 220, 230-31, 54 L. Ed. 2d 424, 435-36, 98 S. Ct. 458, 465-66.

*Foster* and *Moore* reveal the flaw in defendant's argument: the rationale for suppressing an identification tainted by extrajudicial suggestiveness simply does not apply here. Suppression seeks to avoid the risk that a suggestive pretrial identification will result in a mistaken or deceptively certain identification at trial. Danny O'Neal Morris attempted no pretrial identification, and so the risk is minimal that his identification in court was influenced by extrajudicial suggestiveness. It is true that Morris identified defendant under suggestive circumstances at trial, but it does not follow that defendant was denied due process.

In *People v. Finch* (1970), 47 Ill. 2d 425, 266 N.E.2d 97, *cert. denied* (1971), 404 U.S. 836, 30 L. Ed. 2d 68, 92 S. Ct. 122, the defendant argued that he was denied due process when a witness identified him for the first time at trial while he was seated at the counsel table. The *Finch* court rejected this argument, partly because the defendant failed to object and partly because the witness had an independent basis for the identification. (47 Ill. 2d 425, 430-31.) In *People ex rel.*

*Blassick v. Callahan* (1972), 50 Ill. 2d 330, 279 N.E.2d 1, our supreme court distinguished from in-court identification police lineups, and relied on *Finch* for the proposition that "an in-court identification of itself does not deprive a defendant of due process." (50 Ill. 2d 330, 335.) Similarly, this court has repeatedly held that a defendant has no absolute right to avoid identification at trial, suggestive circumstances notwithstanding. See *People v. Patterson* (1980), 88 Ill. App. 3d 168, 176, 410 N.E.2d 396; *People v. Kavanaugh* (1980), 85 Ill. App. 3d 783, 789, 408 N.E.2d 23; *People v. Gregory* (1976), 43 Ill. App. 3d 1052, 1057-58, 357 N.E.2d 1251; *People v. Petty* (1973), 10 Ill. App. 3d 975, 979, 295 N.E.2d 275.

■ In our view, suggestiveness at trial, absent the taint of extrajudicial suggestiveness, does not offend due process because the trial itself affords the defendant adequate protection. The defendant receives the full benefit of a trial by jury, under the guidance of an impartial judge, with representation by counsel and witnesses subject to oath and cross-examination. We stress cross-examination, "the greatest legal engine ever invented for the discovery of truth." (V Wigmore, Evidence sec. 1367 (Chadbourne rev. 1974).) Where a witness first identifies the defendant at trial, defense counsel may test the perceptions, memory and bias of the witness, contemporaneously exposing weaknesses and adding perspective in order to lessen the hazards of undue weight or mistake. (*Cf. Moore v. Illinois* (1977), 434 U.S. 220, 230 n.5, 54 L. Ed. 2d 424, 435 n.5, 98 S. Ct. 458, 465-66 n.5.) We emphasize, too, that the jury is capable of observing and weighing the suggestiveness of an in-court identification, if that identification is unaffected by extrajudicial suggestiveness. (See IV Wigmore, Evidence sec. 1130 (Chadbourne rev. 1972) (in-court identification has "little testimonial force").) As Mr. Justice Black commented:

"[T]he jury is the sole tribunal to weigh and determine facts. That means that the jury must, if we keep faith with the Constitution, be allowed to hear eyewitnesses and decide for itself whether it can recognize the truth and whether they are telling the truth. It means that the jury must be allowed to decide for itself whether the darkness of the night, the weakness of a witness' eyesight, or any other factor impaired the witness' ability to make an accurate identification. To take that power away from the jury is to rob it of the responsibility to perform the precise functions the Founders most wanted it to perform." *Foster v. California* (1969), 394 U.S. 440, 447, 22 L. Ed. 2d 402, 409, 89 S. Ct. 1127, 1131 (Black, J., dissenting).

■ In this case, Morris saw the face of the person who carried

the gun for only a couple of seconds, but he testified that his attention was drawn by the gunshots. He described two men to the police that evening, and the descriptions fit defendant and Hernandez. He positively identified defendant in court nine months later. The totality of circumstances indicated that Morris' identification was sufficiently reliable to permit him to testify. (See *People v. Manion* (1977), 67 Ill. 2d 564, 571, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513; *People v. Finch* (1970), 47 Ill. 2d 425, 429-30, 266 N.E.2d 97, *cert. denied* (1971), 404 U.S. 836, 30 L. Ed. 2d 68, 92 S. Ct. 122.) At trial, Morris identified defendant from a photograph of a lineup, and after asking defendant to remove his eyeglasses, identified him at counsel table. Defense counsel cross-examined Morris concerning lapse of time since the shooting, and commented in closing argument about the suggestiveness of the identification. Defendant was not deprived of a fair trial simply because the testimony was imperfect. Just as the jury could consider the imperfect testimony of Hernandez and Santana, we believe that the jury was entitled to hear Morris' testimony. We trust that the jury reached its verdict based on all of the evidence.

■■ Defendant next contends that improper comments by the prosecutors deprived him of a fair trial. He argues that their remarks concerning Theresa Santana's relocation under a witness protection program violated a motion *in limine*. Defendant argues further that the prosecutor cast aspersions on defense counsel and misstated Hernandez' culpability. The State argues generally that the comments were waived, proper or harmless.

In general, matters in evidence and reasonable inferences therefrom are proper subjects of comment to the jury. (*People v. Warmack* (1980), 83 Ill. 2d 112, 125-26, 413 N.E.2d 1254; *People v. Hairston* (1970), 46 Ill. 2d 348, 375, 263 N.E.2d 840, *cert. denied* (1971), 402 U.S. 972, 29 L. Ed. 2d 136, 91 S. Ct. 1658.) A reviewing court should assess arguments of counsel in the context of the whole trial, and should sustain a conviction unless it appears that improper comment substantially prejudiced the accused. See *People v. Baptist* (1979), 76 Ill. 2d 19, 28-29, 389 N.E.2d 1200; *People v. Tate* (1970), 45 Ill. 2d 540, 545-46, 259 N.E.2d 791, *cert. denied* (1971), 401 U.S. 941, 28 L. Ed. 2d 222, 91 S. Ct. 944.

■■ The record reveals that Assistant State's Attorney McMahon first referred to "protection" for Santana, and that defense counsel properly argued that no evidence supported this remark. Assistant State's Attorney Brian Telander's rebuttal argument contained the following colloquy:

"MR. TELANDER [assistant State's Attorney]: [D]id Theresa Santana say she wanted protection? As long as he [defense counsel] brought it up, I'll tell you. Three weeks after this, we had to move her to Texas.

MR. KULL [defense counsel]: Objection, objection.

THE COURT: That's not the evidence, that's not the evidence. Overruled, proceed.

MR. TELANDER: For three weeks she sat in her house.

THE COURT: Excuse me, where she is at now has nothing to do with the case, ladies and gentlemen of the jury.

\* \* \*

MR. TELANDER: I think it's asking a lot to have her come back now and have her pick her life and that's it, adios, out of Chicago. How much can you ask of her?

MR. KULL: Objection.

THE COURT: Overruled.

\* \* \*

MR. TELANDER: Do you think she enjoyed testifying against gang members? Do you think she enjoyed not going to school and leaving town? You know that's not true."

The prosecutors' remarks in rebuttal were improper, inflammatory and not based on evidence. Because the prosecutor first raised the protection issue, and because defense counsel's responsive remark was proper, we reject the State's argument that the comments in rebuttal were invited. We conclude that the trial court erred in overruling defendant's objections to these clearly improper remarks.

■ We find, however, that these comments were not a material factor in defendant's conviction, and so do not warrant reversal. The evidence of defendant's guilt, considered *in toto*, was overwhelming. The only issue in the case was identification. Two independent eyewitnesses, both familiar with defendant, identified him as the shooter. A third witness heard shots and immediately thereafter saw a man, identified as defendant, running away from the scene with a gun in his hand. The State produced evidence of motive which was corroborated by members of rival gangs. By contrast, the improper remarks by the prosecutors bolstered the credibility of one witness, and did so only tangentially. The primary impact of the remarks was to indicate that Theresa Santana was afraid of defendant and his gang, an inference supported by the evidence. Further, although the trial judge overruled defendant's objections, he admonished the jury that the prosecutors' comments were irrelevant and unsupported in the evidence. We conclude, therefore, that these remarks did not prejudice

defendant to the point of requiring reversal. See *People v. Baptist* (1979), 76 Ill. 2d 19, 29-30, 389 N.E.2d 1200.

We find further that the prosecutors improperly cast aspersions on defense counsel and misstated law in order to minimize the impact of the plea bargain with Hernandez. (See *People v. Brown* (1983), 113 Ill. App. 3d 625, 447 N.E.2d 1011; *People v. Monroe* (1981), 95 Ill. App. 3d 807, 420 N.E.2d 544.) However, these comments were fleeting and oblique, and in view of the strength of the evidence, we do not believe that they affected the jury's deliberations. Defendant complains of other comments, but we deem any error to have been waived by defendant's failure to object contemporaneously and his failure to specify such comments in his post-trial motion. (See *People v. Carlson* (1980), 79 Ill. 2d 564, 576-78, 404 N.E.2d 233.) In view of the number of objectionable remarks made by the prosecutors in this case, we feel compelled to remind Assistant State's Attorneys McMahon and Telander that their duty to protect the rights of the people of Illinois includes a duty to safeguard the rights of criminal defendants. See *People v. Lyles* (1985), 106 Ill. 2d 373, 411-12.

Finally, defendant contends that the imposition of a natural life sentence upon a 16 year old violates the United States and Illinois constitutions. He maintains that section 5—8—1(a)(1)(c) of the Unified Code of Corrections (the Code) (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1(a)(1)(c) violates the Illinois Constitution's due process clause (Ill. Const. 1970, art. I, sec. 2), the separation of powers provision (Ill. Const. 1970, art. II, sec. 1), and the "objective of restoring the offender to useful citizenship." (Ill. Const. 1970, art. I, sec. 11.) He also argues that his sentence amounts to cruel and unusual punishment prohibited by the eighth amendment to the Federal Constitution. U.S. Const., amend. VIII.

In *People v. Taylor* (1984), 102 Ill. 2d 201, 464 N.E.2d 1059, our supreme court held that the mandatory natural life sentencing provision violated neither the separation of powers doctrine, nor the objective of restoring offenders to useful citizenship. *Taylor* is dispositive of the like claims of the instant defendant. Further, because one of the defendants who was sentenced to natural life imprisonment in *Taylor* was 16 years old at the time of the crime (102 Ill. 2d 201, 204), we consider *Taylor* to be at least persuasive authority for the rejection of defendant's argument here, that his youth requires special consideration.

With respect to due process, defendant asserts that this natural life sentence contradicts the express intent of the legislature to exempt minors from enhanced criminal penalties. He points to the ex-

emptions for persons under age 17 from extended-term sentencing (see Ill. Rev. Stat. 1981, ch. 38, par. 1005—5—3.2(b)) and for persons under age 18 from the death penalty (see Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)). Defendant reasons that the legislature could not have intended to exempt minors from the death penalty, but to subject them to its alternative, natural life imprisonment. The State maintains that the provision is rationally based on a policy of permanent segregation from society, and that it applies to anyone who commits multiple murder, regardless of age. We agree with the State.

■■ ■ Statutes are presumed constitutional, and the burden of showing invalidity is on the party challenging the statute. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 499, 431 N.E.2d 344.) The legislature is empowered to classify offenses and prescribe penalties, and such power will be nullified by a court only if the statute violates a constitutionally assured right. *People ex rel. Carey v. Bentivenga* (1981), 83 Ill. 2d 537, 542, 416 N.E.2d 259.

■■ We see no inconsistency in a legislative scheme which subjects minors to natural life imprisonment but mercifully exempts them from the death penalty, for "the penalty of death is qualitatively different from a sentence of imprisonment, however long." (*Woodson v. North Carolina* (1976), 428 U.S. 280, 305, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991.) The cases relied upon by defendant, *People v. Wisslead* (1983), 94 Ill. 2d 190, 446 N.E.2d 512 and *People v. Wagner* (1982), 89 Ill. 2d 308, 433 N.E.2d 267, are easily distinguished: both cases invalidated statutory schemes which imposed more serious punishment for less serious criminal conduct. The plain meaning of section 5—8—1(a)(1)(c) is that, regardless of age, a defendant found guilty of murdering more than one victim must be sentenced to a term of natural life in prison. (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1(a)(1)(c); see *People v. Hudson* (1981), 95 Ill. App. 3d 350, 355-56, 420 N.E.2d 271.) The provision is reasonably designed to protect a legitimate interest (see *People v. La Pointe* (1981), 88 Ill. 2d 482, 501, 431 N.E.2d 344), and its application to this defendant was consistent with due process.

■■ We find defendant's argument concerning cruel and unusual punishment to be meritless. Drawing an analogy between the death penalty and natural life in prison, defendant argues that the preclusion of evidence in mitigation renders section 5—8—1(a)(1)(c) violative of the eighth amendment. Our supreme court implicitly rejected this analogy in *People v. Taylor* (1984), 102 Ill. 2d 201, 464 N.E.2d 1059, by reversing that portion of the appellate court decision which depended upon it. (See *People v. Taylor* (1983), 115 Ill. App. 3d 621,

626-27, 450 N.E.2d 1256, *aff'd in part, rev'd in part* (1984), 102 Ill. 2d 201, 464 N.E.2d 1059.) The death penalty is different in kind from any period of imprisonment. (*Woodson v. North Carolina* (1976), 428 U.S. 280, 305, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991.) The legislature determined that where a defendant committed two or more murders, no set of mitigating circumstances would permit a penalty less than natural life in prison. The Constitution compels no contrary determination.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed. Pursuant to *People v. Agnew* (1985), 105 Ill. 2d 275, 473 N.E.2d 1319, the State's Attorney's fee request is hereby granted, and a fee of $75 is assessed against defendant.

Affirmed.

MEJDA, P.J., and SULLIVAN, J., concur.

## SUPPLEMENTAL OPINION ON DENIAL OF REHEARING

JUSTICE LORENZ delivered the opinion of the court:

Defendant asserts that this court has overlooked a number of facts and arguments in affirming his conviction. We considered all of the arguments of the parties and the entire record in this case, as we are duty bound to do in every case. Yet, in the interests of justice and finality, we address these alleged oversights.

In his petition for rehearing, defendant states that this court "failed to note that Morris was shown [the lineup] photo *immediately before* identifying Rodriguez as the shooter." (Emphasis in original.) On the contrary, this court noted, "At trial, Morris identified defendant from a photograph of a lineup, *and after asking defendant to remove his eyeglasses*, identified him at counsel table." (Emphasis added.) We believe that our statement is the more accurate one. Moreover, we agreed with defendant that the identification was suggestive, but held that in these circumstances, defendant was not denied due process. Defendant argues that *Foster* and *Moore* require reversal, but we adhere to our analysis of these cases.

■■ Defendant maintains that our reliance on *People ex rel. Blassick v. Callahan* (1972), 50 Ill. 2d 330, 279 N.E.2d 1, is misplaced, because *Blassick* addressed the contention that the accused could avoid in-court identification, whereas defendant in the present case made no such argument. This distinction is not borne out by the record, which reveals that defense counsel made precisely this argument at trial:

"What I'm going to ask the court to do is preclude. I see no reason and I see it to be highly prejudicial at this point in time if they ask him 'Do you see anywhere in court the fellow you saw running through here?' or 'Does that look like the guy you identified?' Because there has been no identification procedure here. He's sitting with me here next to the counsel table. He's obviously the Defendant. I don't know if he's seen other photos or not at this time. And they should be precluded from asking that question ***."

After the assistant State's Attorney suggested that Morris be shown a lineup photo, defense counsel reiterated:

"The motion is still that he should be precluded because an identification at this point is highly suggestive and overwhelmingly prejudicial."

This same argument was rejected in *Blassick*, and our opinion on the issue covers defendant's position at trial as well as his new argument in this court.

 Defendant argues strenuously that this court "completely failed to address or mention four other examples of improper comments by the prosecutor." Not true. This court stated, "Defendant complains of other comments, but we deem any error to have been waived by defendant's failure to object contemporaneously and his failure to specify such comments in his post-trial motion. [Citation.]" Of the four additional remarks, two were fairly innocent when read in context. Defendant claims that the prosecutor vouched for Morris' credibility by stating:

"You've also got to believe the State's Attorney's Office, he doesn't want to say it, but you have to believe it that we are in on it, that the police are in on it, that we made Danny Morris come in here and he didn't want to and identify him."

In context, the prosecutor argued that Santana made a positive identification of a person known to her; that she was either lying or telling the truth, but was not mistaken; and that *if* she was lying, *then* the State's Attorney's Office, the police and the other witnesses all participated in the frame-up. It is abundantly clear that the prosecutor was pointing out the implications of the defense theory in the case, and was not vouching for the credibility of any of the witnesses.

Defendant argues that the prosecutor speculated on what he (defendant) would do if acquitted by saying:

"Today is the day it catches up to him for creeping around the gangways and the alleys of our city with a gun, for stalking his victims, for killing two innocent people indiscriminately without

mercy, without concern, whether it's a girl or a boy, a young man or an old man, and then for scurrying off into the night to do it again."

It appears to us that this comment was aimed at defendant's conduct at the time of the crime, and did not amount to a prediction of the consequence of an acquittal.

■■■ Defendant also argues that the prosecutor dwelt on the seriousness of the crime when he said, "[T]his case, ladies and gentlemen, is the worse [sic] crime I have ever seen as a prosecutor." We note that the quoted remark followed a similar comment by defense counsel, to wit: "What happened to those two kids is the most brutal, disgusting, senseless, ugly crime that was ever committed." We do not condone the prosecutor injecting his personal assessment or professional judgment of the severity of a crime into the trial, but we think it is unrealistic to hold the prosecutor to a standard of sterile analysis in response to defense counsel's touching show of humanity.

Defendant argues, with some merit, that the prosecutor evoked sympathy on behalf of the victims, their mother, and prosecution witnesses. The prosecutor stated:

"You know, did he [defendant] ask Theresa or Joe, 'Would you like to live maybe a few more years?'

Did he ask them, you know, 'would you like someday to grow up and marry and fall in love and have kids?'

Did he think about that when he did it? Did he say, 'well, maybe you'd like to have you know, a few more moments of life. Kiss your mother goodbye, say goodbye to your brother.'

Did he care? Don't forget, don't let the crime get lost in the garbage on the side. You can't forget and don't forget what he did to that woman.

Three people died that night, and you know it. Her life is over, his mother's life is over. She will never bee [sic] the same again. It is over. She will carry this her whole life, and I want you to be angry with him because you should be."

Although the comment is inflammatory and improper, the main body of our opinion notes that the issue in the case was identification, and the resolution of that issue turned on the credibility of the three identification witnesses. In our view, it is likely that the jury was outraged by the nature of the crime and sympathetic to the victims and their mother long before any of the closing arguments. The jury was instructed to decide the case based on the evidence, and not on the basis of counsel's arguments or their individual sympathies. We trust that the jury followed instructions, and we adhere to our opinion that

improper comments were not a material factor in defendant's conviction.

■■■ Finally, defendant states that this court failed to discuss his argument that it makes no sense for the legislature to exempt minors from an extended term, but to subject them to natural life imprisonment. It is true that we focused upon the death penalty and mentioned extended-term sentencing only in passing. We take this opportunity to address defendant's argument.

An extended-term sentence may be imposed upon an offender if he or she was previously convicted of the same or a more serious felony; if the offense was accompanied by wanton cruelty; if the crime was committed against a relatively helpless person; or if the offense involved multiple sexual assault of the same victim. (Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3.2(b).) A natural life sentence may be imposed for murder accompanied by certain aggravating factors, and a term of natural life must be imposed where an offender is found guilty of more than one murder or is adjudged a habitual criminal. (Ill. Rev. Stat. 1983, ch. 38, pars. 1005—8—1(a)(1), (2).) In view of the overlap in circumstances warranting enhancement, reasonable minds could differ as to the consistency of exempting minors from extended terms but not from natural life terms. However, due process does not mandate complete legislative consistency. A statute is a proper exercise of police power so long as it is "reasonably designed to remedy the evils which the legislature has determined to be a threat to the public health, safety and general welfare.' " (*People v. Bradley* (1980), 79 Ill. 2d 410, 417, 403 N.E.2d 1029, quoting *Heimgaertner v. Benjamin Electric Manufacturing Co.* (1955), 6 Ill. 2d 152, 159, 128 N.E.2d 691.) The legislature has placed multiple murder and habitual criminality in a separate category from other crimes, and the legitimacy of this distinction cannot be questioned from a public safety standpoint. We cannot say that it is irrational for the legislature to have mandated a greater punishment for these crimes, and the refusal to exempt minors from such punishment seems to us reasonably designed to remedy the perceived threat of multiple murder. Accordingly, we reject defendant's argument.

Affirmed.

MEJDA, P.J., and SULLIVAN, J., concur.