**People of the State of Illinois, Plaintiff-Appellee, v. Steve Willis, Defendant-Appellant.**

**Gen. No. 52,400.**

First District, Third Division.

June 18, 1970.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Shelvin Singer and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Robert McGee, Assistant State's Attorneys, of counsel), for appellee.

MR. PRESIDING JUSTICE DEMPSEY delivered the opinion of the court.

Steve Willis was tried by a jury for armed robbery, convicted and sentenced to a term of four to six years in the penitentiary. He contends that his identification

was so weak as to raise a reasonable doubt of his guilt and that it was the product of suggestive out-of-court identification procedures. He also argues that the prosecution improperly informed the jury of his prior criminal record.

Three young men robbed a Chicago grocery store owned by Pablo and Andrea Rivera on August 31, 1966, at about 1:00 p. m. Mrs. Rivera was near the door when the three entered. Two of them, the one identified as Willis and Paul Scott (who subsequently pleaded guilty to the crime), had guns in their hands. Scott announced, "This is a stickup, give me your money. If you don't I will kill you." Scott took $12 from behind the counter and placed it in a bag. The other two went over to Rivera who was about twelve feet away. Willis threatened, "Don't move from here or I will kill you." When Rivera moved, Willis fired his gun, hitting three cans of fruit. He held the gun on Rivera with his right hand and with his left opened the cash register and took about $115. He also took Rivera's wallet. The robbers then locked the Riveras in a washroom. The entire robbery took less than five minutes.

Mrs. Rivera testified that she had seen Willis, whose name she did not know, in the store a few times; she had seen Scott many times. Rivera knew Willis by sight because of his coming into the store on three occasions; on one of these occasions—the day before the robbery—he had asked about Rivera's son. The third participant was not recognized and was never identified.

Mrs. Rivera testified that two days after the robbery she was shown a large number of pictures at police headquarters and that she picked out those of Scott and Willis. After they were arrested for the robbery she identified them in police lineups. Rivera testified that he did not see any photographs, but he did

view a lineup. While he could not identify anyone in the lineup, he recalled that his wife had picked out Scott.

Willis and Scott and three other men were arrested for an unrelated matter on September 2, 1966. A gun, identified at the trial by Rivera as the one Willis used in the robbery, was found in the automobile in which they were riding. A comparison test was attempted to see if the gun fired the bullet recovered from the Rivera store, but the bullet was so damaged that the test was impossible. The record does not show whether Willis and Scott were taken into custody on September 2nd and if they were how long they were held. That they were later released is clear from the fact that Scott was arrested for the Rivera robbery on October 19, 1966, and Willis sometime later.

Scott confessed to the crime. In a written statement he said that he was forced to take part in the robbery. The names of the men who were with him were not mentioned in the statement. Scott pleaded guilty and testified for his friend Willis. He denied that Willis was one of the robbers. He admitted being in the Rivera store many times and related the details of the robbery. He said that he and two others, whose names he did not know, planned the robbery in the morning but waited until 1:00 p. m., so that each one could get a gun. He said he was the one who fired the shot and that the gun found in the automobile at the time he and Willis were arrested on September 2nd was his. He admitted that his written statement was made voluntarily, that everything contained in it was exactly what he had told the police officers; he also admitted that he spoke to the officers after having signed the statement. He denied telling them in this conversation that Willis was one of the robbers but that they would never get him to admit this in court. He volunteered,

however, that he followed a neighborhood code of never involving another in a crime. He also stated that he would probably lie to protect Willis.

Two police officers rebutted Scott's testimony. They said that after he signed the written statement he told them that he was not forced into the robbery, that Willis was one of the robbers but then said, "You will never get me to say that in court." He also told them that the robbery was Willis' idea and that the third robber was a friend of Willis', whose name he did not know.

Willis did not testify but two witnesses, in addition to Scott, testified in his behalf. One of these, a mother of twelve children, testified that Willis had been with her throughout the day of August 31st assisting her in making funeral arrangements for a son, a close friend of Willis', who had died August 26th. She said that he accompanied her to a florist about noontime and to a funeral home where they stayed until 1:30 or 2:00 p. m. The director of the funeral home testified that they were there on August 31st somewhere between the hours of 11:00 and 1:00 p. m. A business record of the financial arrangements for the funeral, dated August 31, 1966, was introduced into evidence.

It is argued that the failure of Pablo Rivera to identify Willis at the lineup casts doubt on his identification. This argument assumes that Willis was in the lineup. There is no testimony to this effect. Mrs. Rivera testified that she attended more than one lineup and that she picked Willis out in one of them. There was no testimony that her husband was present at that time. There was some confusion in the Riveras' testimony about photographs, lineups, police station appearances, court appearances and dates. Part of the confusion may have come about because of the different dates Scott and Willis were arrested for the robbery. A police report indicated that the Riveras were shown a group of

pictures, which included one of Scott but not of Willis, the day of the robbery. Scott was identified and a warrant was taken out for his arrest. Upon Scott's arrest on October 19, 1966, lineups were held. On October 26, 1966, pictures, including one of Willis, were shown to Mrs. Rivera. Mrs. Rivera identified Willis' picture and also picked out a picture which she thought looked like the third robber. However, when she saw him in person she was not sure and he was not prosecuted. The lack of clearness in the Riveras' testimony came about not only because of the fact that the identification of Scott's and Willis' pictures occurred on different days and their lineup identifications occurred on different days, but also because of language difficulties. Rivera testified through interpreters and Mrs. Rivera spoke Spanish and did not communicate with ease in English. Some of her speech was broken, she was unfamiliar with police procedures and she was confused by some of the questions she was asked. But both she and her husband were positive and unshaken in their identification of the defendant Willis.

Willis points out the following factors pertaining to his identification which, he argues, make his identification uncertain and doubtful: (1) a report by an investigating officer that Scott fired the gun at Pablo Rivera, whereas both Riveras testified at trial that Willis fired the gun; (2) Mrs. Rivera's only description of the robbers was that they had dark skin; she gave no other physical characteristics and Rivera gave none at all; (3) neither of the Riveras said that they had seen Willis before; (4) Mrs. Rivera did not describe Willis' clothing, but she did that of Scott; (5) Rivera failed to note Scott's presence during the robbery, and (6) Andrea and Pablo Rivera testified that Willis was about 5 feet, 6 inches tall, whereas his height is 5 feet, 10 inches.

353

As to points (1) and (2), the investigating officer's report was a collection of information gathered from many sources; it did not pretend to accurately reflect each witness' individual statement. As to point (3), the Riveras did tell an investigating officer that Willis and Scott were known to them. As to points (4) and (5), Scott was the robber close to Mrs. Rivera and it was he who took $12 from her custody; Willis was the man who robbed Rivera. Mrs. Rivera was concentrating on Scott, her husband on Willis. As to point (6), the record shows that the Riveras had difficulty in estimating heights. After having testified that Willis was 5 feet, 6 inches, Pablo Rivera was asked on cross-examination to look at Willis and estimate his height. Rivera said that he did not know how to tell his height, and that he could not say whether Willis was more or less than 5 feet, 6 inches. On her cross-examination Mrs. Rivera was asked to estimate the height of Paul Scott, whom she had identified as one of the robbers. She responded between five and six feet, and it was only on further questioning that she said he was about the height of defense counsel, about 5 feet, 10 inches.

Some of the factors cited by the defendant are relevant in ascertaining the accuracy of his identification, but they are not necessarily determinative. Slight discrepancies do not destroy the credibility of eyewitnesses but only go to the weight to be given their testimony. People v. Parker, 98 Ill App2d 146, 240 NE2d 475 (1968). The minor discrepancies in the Riveras' testimony and the variations between their testimony and the investigating officers about the dates they attended lineups and the number of times they were shown photographs, are inconsequential in comparison to their previous acquaintance with Willis, the excellent opportunity they had to view him during the robbery and their unwavering identifications before and at the trial. Their identifications were based on his

face, not on his other physical characteristics or clothing. It is the province of the jury to determine the credibility of all witnesses and the weight to be given their testimony, and its verdict will not be reversed unless the evidence is so unsatisfactory as to leave a reasonable doubt of the defendant's guilt. The jury weighed the Riveras' testimony against that of the defendant's witnesses and determined that he was guilty. The evidence supported the jury's verdict.

██ ██ The defendant's final two contentions concern the use of his picture. First, it is argued that Mrs. Rivera's selection of his picture was influenced by a police officer and, second, that his picture was improperly used at the trial. Mrs. Rivera testified that, as she was looking at photographs, an officer told her that Willis was in custody. Although such a comment would be improper it did not, under the facts of this case, tend to induce a misidentification. At the trial Mrs. Rivera was shown a picture of Willis which she said was the one she had picked out at the police station. A police officer also identified the picture. Willis argues that this indicated to the jury that he had a criminal record. The picture was not admitted into evidence and there is no indication in the record that it bore suggestive legends or numbers, or that it was shown to the jury. The jury received no improper information and the defendant was not prejudiced by the trial procedure.

The judgment is affirmed.

Affirmed.

SCHWARTZ and McNAMARA, JJ., concur.