THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
HUBERT GREGORY, Defendant-Appellant.

First District (3rd Division)   No. 61821

Opinion filed November 18, 1976.

Nicholas T. Kitsos and Alfred L. Levinson, both of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Iris E. Sholder, and Linda Dale Woloshin, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE DEMPSEY delivered the opinion of the court:

The defendant, Hubert Gregory, and his accomplice, Leroy Dixon, were indicted for the armed robbery of Ben Polisky and for the armed robbery and murder of his nephew, William Polisky. The cases against the two defendants were severed. Gregory waived a jury trial, was found guilty of the three crimes and was sentenced to concurrent terms of 5 to 15 years for the armed robberies and 30 to 60 years for murder. Dixon subsequently pleaded guilty and was sentenced to 14 to 30 years for murder.

Gregory contends that the trial court erred in holding him accountable for Dixon's actions; that the court was responsible for his in-court identification by Polisky, and that the disparity between his sentence and the sentence imposed upon Dixon amounted to a denial of his right to due process and the equal protection of the law.

On April 7, 1971, Polisky and his nephew were waiting on customers in Alex's Loan, a pawnshop located at 35th Street and Calumet Avenue, Chicago. In the middle of the afternoon, Gregory, a man whom Polisky had seen on four or five previous occasions, entered the store. Polisky asked him if he could be of help. Gregory replied, "I'll be back" and walked out.

Five to ten minutes later, Gregory returned. Polisky was standing behind a showcase and his nephew was behind the cashier's cage. Gregory walked over to the showcase and asked to see some rings. While Polisky was inquiring about the rings he wanted to examine, another man (later identified as Dixon) entered the shop and went towards the cashier's cage. As Dixon passed the showcase, Gregory pulled out a gun and said: "Give me some of the rings."

When Dixon reached the cashier's cage he fired a shot at Polisky's nephew, jumped into the cage and shot him a second time. While this was

taking place, Polisky gave Gregory 15 or 16 rings. As Dixon ran out of the cage, Gregory told Polisky: "You go back there and sit on the floor, or I'll kill you." After the men fled, Polisky went into the cashier's cage and saw his nephew lying on the floor, mortally wounded. The police, summoned by an alarm button, arrived two minutes later.

Polisky told the police that he knew Gregory but not his name. He described him as about 20 years of age, with a lighter complexion than his accomplice. He said he was wearing a hat shaped like those worn by Shriners which had red and white stripes, a black coat and a pair of sunglasses which Polisky had sold to him just two weeks before.

After his arrest, Gregory was questioned by an assistant State's attorney. Gregory told the assistant that he and Leroy Dixon went to the pawnshop and discussed robbing it; that he was initially opposed to the idea, but Dixon persisted. He went into the pawnshop alone, talked to a clerk and came back out. Dixon gave him a gun and the two entered the shop together. He went up to the counter while Dixon went to the back of the store. So that nothing would look suspicious, he asked the man behind the counter to show him some rings. He heard Dixon say, "Hold it," and his order was immediately followed by a shot. Gregory then drew his gun, heard a second shot, took the rings from the clerk and told him to lie down. Dixon came from the back of the shop carrying a bundle and they left the premises.

During the transcription of this statement, the assistant State's attorney showed Gregory a key ring which had six rings attached to it. Gregory identified a Masonic ring as one of those taken in the robbery.

At the defendant's trial it was stipulated that if one of the investigating officers were called to testify, he would state that Polisky described Gregory as a male Negro, 18 to 22 years old, 5 feet 11 inches tall, weighing 160 pounds and wearing a multicolored sailor hat, which was turned down, a dark coat, tan sunglasses and dark pants.

A second investigating officer testified for the defense and said that Polisky described Gregory as a male Negro, between 18 and 20 years of age, about 6 feet tall, of slender build and that he was wearing a pill-box hat, wire rim sunglasses with brown lenses, a shirt with blue stripes and a brown coat. He also stated that Polisky said he was placing the rings Gregory wanted to see on the counter before Gregory pulled out his gun, and that the rings taken by him were stone rings with white or yellow metal bands.

Gregory, who did not testify in his own behalf, contends that he had no intention of robbing the pawnshop prior to Dixon's act of murder and that it was reversible error for the trial court to disregard this contention, which he claims was substantiated by his confession, in favor of Polisky's version of the events because Polisky's testimony was confused and

unreliable. In support of this latter assertion, he points out that at the trial, Polisky described Gregory's hat as being a Shriner's hat, with red and white stripes, but that he told a police officer that the hat looked like a multicolored sailor hat which was turned down; that in response to a question about what kind of rings were taken in the armed robbery, Polisky testified that he remembered a Masonic-type ring, and yet he told the police that the rings were white and yellow metal with stones, and that he testified that Gregory pulled a gun prior to his removing the rings from the showcase and prior to the murder, but that he told an investigating officer that he put the rings on the counter before Gregory displayed his gun. Gregory argues that the trial court should have rejected Polisky's testimony, and concludes that it should not have convicted him for the murder of William Polisky because a person cannot be held accountable as a principal of a crime for an action which occurs after the offense.

■■ Slight discrepancies do not destroy the credibility of an eyewitness but only go to the weight to be given his testimony. (*People v. Willis* (1970), 126 Ill. App. 2d 348, 261 N.E.2d 723.) It is within the province of the trier of fact to determine what effect these minor discrepancies have upon the witness' credibility (*People v. Lemon* (1966), 70 Ill. App. 2d 413, 218 N.E.2d 8) and that determination will not be disturbed unless the evidence is so unsatisfactory as to raise a reasonable doubt of the defendant's guilt. *People v. Ashford* (1974), 17 Ill. App. 3d 592, 308 N.E.2d 271.

We find no major discrepancies in Polisky's descriptions of Gregory's hat. Polisky told one of the two investigating officers that the hat looked like a pill-box; he told another that it looked like a turned-down sailor's hat. In reference to the latter description, there is some question whether Polisky ever characterized the defendant's hat in this fashion. Polisky testified that one of the police officers suggested a "sailor hat" when he was not able to think of an apt description. Polisky also stated that he disagreed with this comparison. Regardless of who depicted Gregory's hat in this way, the descriptions of his hat as one resembling a turned-down sailor hat, or a pill-box or the fez worn by Shriners, were not so dissimilar to each other as to constitute significant variations.

Even if Polisky's descriptions of Gregory's hat varied, his description of the rest of his clothing and his physical characteristics was clear and accurate. He had seen Gregory, who stood no more than 2 feet from him during the robbery, on several prior occasions and had sold him a pair of sunglasses just 2 weeks before.

■■ There was no discrepancy in Polisky's description of the stolen merchandise. The police officer testified that his statement about yellow and white metal rings with stones only amounted to a partial description. It is apparent that this description constituted a general account of what

was taken, while Polisky's testimony about the Masonic ring was a specific reference to one of the stolen rings. That a Masonic-type ring was actually one of those stolen, is evidenced by the fact that during the taking of his confession Gregory identified the Masonic ring as one of those taken in the armed robbery. Although the investigating officer's testimony that Polisky told him that he had already put the rings on the counter before Gregory pulled the gun, was somewhat inconsistent with Polisky's testimony, this was but a minor discrepancy which does not alter our conclusion that Polisky's testimony was credible and that Gregory was proved guilty beyond a reasonable doubt.

■■ Additionally, Gregory's prior intent to rob the pawnshop was established by his own confession. He admitted that he and Dixon talked about the robbery and that after this he entered the shop alone. Obviously, this was for the purpose of seeing who was inside. He reported back to Dixon and accepted a gun from him. Although he said he was initially opposed to the armed robbery, he said he yielded to Dixon's persuasions, and he stated that his purpose in asking Polisky to show him some rings was to camouflage the fact that he and Dixon were going to commit a robbery. From these statements, it is evident that he formed the intent to commit an armed robbery before Dixon murdered William Polisky. He was properly held accountable for both crimes. When two or more persons have a common design to commit an unlawful act, the act of one is the act of all and all are equally guilty of whatever crime is committed. *People v. Smith* (1972), 8 Ill. App. 3d 270, 290 N.E.2d 261.

Gregory's contention that the trial court caused his in-court identification is based upon the court's directing Polisky to look around the courtroom after he had said he could not see the man who robbed him, and upon the court's denial of his pretrial motion to be seated elsewhere than at the counsel table. The first part of this contention is predicated on the following colloquy:

"Prosecutor: Now, the man who came into the store at that time, had you ever seen him before, sir?

Polisky: Yes.

Prosecutor: Would you look around the courtroom now. Do you see that man in court today?

Polisky: I don't see him.

Prosecutor: Do you want to get down off the witness stand—

Defense Attorney: Objection, your Honor. The witness has answered.

The Court: Just a moment, counsel. Do you want to stand up and see? You can look around.

Defense Attorney: May I have the last answer read, your

Honor? The witness said something, I want to be sure on the record—

The Court: Would you stand up and look around?

Defense Attorney: Your Honor.

The Court: We will read it back.

Defense Attorney: May I have it?

The Court: Will you stand up and look around?

Polisky: I'd like to have him look at me, I want to see his face."

The witness's answer was reread, after which the following took place:

"Prosecutor: Do you want to step down off the witness stand, Mr. Witness, please?

Defense Attorney: Objection, your Honor.

The Court: Overruled.

Prosecutor: Step down off the witness stand. You said a moment ago that you wanted someone to look at you, is that correct?

Defense Attorney: Objection, your Honor.

The Court: Overruled.

Prosecutor: All right.

Polisky: Yes.

Prosecutor: Which man did you want to look at you?

Polisky: The gentleman sitting right next to the lawyer. That is the gentleman (indicating).

Prosecutor: All right.

Prosecutor: May the record reflect the witness has identified Mr. Hubert Gregory—

Defense Attorney: Objection, your Honor. I ask for a mistrial."

A recess was called. In chambers, the prosecutor stated for the record that from the time Polisky took the witness stand until the recess was called, the defendant had a pen in his hand and bent over a piece of paper in such a way that only the top of his head could be seen by the witness. When the trial was resumed, Polisky was asked:

"Prosecutor: Mr. Polisky, at the time I first asked you to look around the courtroom, did you have occasion to see whether anyone in the courtroom had his head down?

Polisky: Yes, that's the reason I couldn't see him, he had his head down, and I couldn't see him."

■■ The trial court did not instruct the witness to select Gregory nor did it indicate where he could be found in the courtroom. The court merely provided the eyewitness, who was 75 years old and wore bifocals and who had said he wanted to see the face of the man seated next to the lawyer, with an opportunity to do so. The court did nothing improper. See *Jamerson v. United States* (7th Cir. 1933), 66 F.2d 569.

The additional contention by Gregory is that the trial court's denial of

his pretrial motion—requesting that he be allowed to sit somewhere in the courtroom other than at the counsel table—resulted in an invalid identification. He asserts that having a black man sit with a guard at the counsel table was impermissibly suggestive; that it made him so conspicuous that any effort on his part to prevent a misidentification by Polisky was destroyed.

■■ An in-court identification is not rendered invalid by the fact that the defendant is the only member of his race in the courtroom. (*United States v. Moss* (3rd Cir. 1969), 410 F.2d 386.) Also, it has been held that an identification is not rendered improper by the trial court's denial of the accused's motion that he be removed from the counsel table as long as there is an independent basis for that identification. (See generally *People v. Finch* (1970), 47 Ill. 2d 425, 266 N.E.2d 97.) As we have stated, Polisky had an excellent opportunity to view Gregory during the entire duration of the crime. He had seen him on previous occasions and had pointed him out in a lineup two days after the crimes were committed. There was an independent basis for Polisky's identification.

Gregory's last argument is that the disparity between his sentence and Dixon's was a result of his demanding a trial and that this constituted a denial of due process and equal protection of the law.

■■ There is nothing in the record to suggest that Gregory's sentence was influenced by his choosing to exercise his constitutional right to a trial. Gregory and Dixon were indicted together but tried separately. Gregory went to trial first and was sentenced to 30 to 60 years for the murder of William Polisky and to concurrent terms for the two armed robberies. While the jury was being selected for Dixon's trial, he entered into a plea bargaining agreement with the State, changed his plea from not guilty to guilty and was sentenced to a term of 14 to 30 years for the murder. However, the trial judge, who had convicted and sentenced Gregory, did not sentence Dixon on either of the armed robbery counts, even though he pled guilty to both. Although Dixon had no prior criminal record and Gregory a slight one, we believe the spread between their sentences is too great. Both were equally guilty in the eyes of the law, but Dixon was the actual killer, not Gregory. Since we cannot increase Dixon's sentence, we will, in the interest of more evenhanded justice, reduce Gregory's. Pursuant to Supreme Court Rule 615(b)(4) (Ill. Rev. Stat. 1975, ch. 110A, par. 615(b)(4)), we therefore lower Gregory's sentence for the murder to 20 to 40 years.

The judgments of conviction are affirmed, but the defendant's sentence is modified as specified.

Affirmed as modified.

MEJDA, P. J., and McGLOON, J., concur.