THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
AGAPITO VILLALOBOS *et al.*, Defendants-Appellants.

First District (5th Division)   Nos. 77-1758, 77-1962, 78-510 cons.

Opinion filed September 21, 1979.—Rehearing denied December 7, 1979.

Ralph Ruebner and Alan D. Goldberg, both of State Appellate Defender's Office, of Chicago, for appellant Agapito Villalobos.

Alan D. Blumental and Sam Adam, both of Chicago, for appellant Bruno Kramarczyk.

James J. Doherty, Public Defender, of Chicago (Brian L. Heise and Robert T. Badesch, Assistant Public Defenders, of counsel), for appellant Joseph Lochirco.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Pamela L. Gray, and Marcella J. Meyer, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a bench trial defendants were convicted of armed robbery. (Ill. Rev. Stat. 1973, ch. 38, par. 18—2.) Kramarczyk and Lochirco were sentenced to terms of four to eight years while Villalobos was sentenced to a term of five to 10 years. On appeal, they each contend

that they were not proved guilty beyond a reasonable doubt. Additionally, Kramarczyk contends that the trial court erred in failing to suppress his oral statement on the grounds of a *Miranda* violation and that his constitutional rights were violated when the officers arrested him in his home without a warrant.

The following pertinent evidence was adduced at trial.

*For the State*

*Robert Matos, the complaining witness*

He is a security guard employed by the Cohn Detective Agency. On April 25, 1974, about 11:15 p.m. he left his place of employment at 4910 W. Flournoy in Chicago and began driving to his home at 914 W. 19th Place. He took a more circuitous route than normal because he was in no hurry and wanted to drive around. About two miles from his home he felt a great urge to urinate and drove into an alley near the 1800 block of South Oakley for the purpose of "relieving myself." He stopped his car 10 or 15 feet east of the entrance to the alley. He put the car in park and was about to get out when four men came out of a gangway. At first he did not think anything of this. One of the men, whom he identified as defendant Villalobos, approached him and pointed a gun at his head. A second man, whom he identified as Kramarczyk, then ordered him out of the car. When he got out of the car, Lochirco said, "That's right, keep looking at me, punk, you'll see me more often." He was searched, and his wallet containing his badge and identification, but no money, was taken; 35 cents and some screws were also taken from his pocket. The keys were taken out of his car.

An unidentified black man then accompanied him about 100 feet down the alley to the west, and the three defendants followed. When he and the black man stopped underneath a light, he turned and observed the three defendants standing about 25 feet away. They were looking through his wallet. He was afraid they would shoot him if they found his badge, so he hit the black man in the face and ran east past the three defendants. The defendants chased him, but he was able to escape and run into the tavern on the corner. He phoned the police from the tavern. He described the lighting conditions in the alley at the time of the robbery as "good."

Matos further testified that the day after the incident he returned to the scene with a spare set of keys to pick up his car. At that time he was approached by an unknown girl who said she had seen the robbery the previous night while looking out the window. She told him the nicknames of the four assailants were Fish, Augey, Bruno and Bugaloo. Those names were not familiar to him. He did not ask for the girl's name or address and

could not locate her again. Although he telephoned this information to the police department, he could not recall to whom he had spoken.

Several days later, he identified pictures of Villalobos and Lochirco from a group of 40 or 50 photographs shown to him by police officers. At a lineup on May 14, 1974, he identified Villalobos. He viewed 10 or 15 photographs on July 8 or 9, and identified the photograph of Bruno Kramarczyk. He then testified that Kramarczyk was the one who said, "That's right, punk, keep looking at me, you'll see me more often." He testified he identified Kramarczyk in a subsequent lineup on July 12, 1974, and at trial indicated with a mark on a photograph of the lineup the man he identified as Bruno Kramarczyk. He later identified the same photograph as being that of Lochirco.

On cross-examination he admitted telling a police officer that two of the individuals were blonde. However, he admitted that none of the defendants he saw in court had blonde hair and he testified that they appeared the same as they did at the time of the robbery. In court he characterized Kramarczyk's hair as light brown, Lochirco's hair as dark brown and Villalobos' hair as black. He admitted testifying at the preliminary hearing that the lighting was "just medium," but stated at trial that, "I could see exactly what they looked like." He admitted, however, that the lighting was not sufficient to enable him to see the exact features of his assailants.

He further testified that he waited about a half hour until he got home before he urinated; he said it was not a great urge and explained he would have merely been uncomfortable if he had to drive the two miles home rather than stop in the alley.

*Louis Marrello, Chicago Police Officer*

On April 29, 1974, Matos identified photographs of Villalobos and Kramarczyk from a group of 45 to 50 photographs and on July 8 or 9 identified the photograph of Lochirco from a group of 15 photographs. Matos also identified both Villalobos and Lochirco in lineups. He did not know whether Kramarczyk was placed in a lineup. Matos told the police officer who made the initial report of the robbery that Kramarczyk had blonde hair. Marrello, however, characterized Kramarczyk's hair as "light brown." When he questioned Kramarczyk about the incident, Kramarczyk said, "I was there, but there was no robbery. There was a fight." Kramarczyk told him he knew Fish and Augey, but would not answer when asked if they were with him at the time. Kramarczyk further told him a man had come into the alley looking for trouble and there was a fight.

On cross-examination he characterized Villalobos' haircut at the time of the May 14, 1974, lineup as being "a baldy sour" or "very short."

*For the Defendants*

*Agapito Villalobos, on his own behalf*

He was stabbed in January 1974 and half of his head was shaved to treat head wounds. After leaving the hospital he shaved his entire head and was bald on April 24, 1974.

*Dr. Leon Georgio*

The parties stipulated that if called as a witness he would testify that he saw defendant Villalobos in the emergency room of St. Anthony's Hospital on February 23, 1974. One half of Villalobos' head was shaved in order to administer multiple stitches to a head wound. Villalobos was released from the hospital on February 28, 1974.

*Officer Neiddlac, Chicago Police Officer*

The parties stipulated that if called as a witness, Neiddlac would testify that on April 25, 1974, at about 11:45 p.m. he interviewed Robert Matos at 1847 S. Oakley, the scene of the incident. Matos described his assailants as follows:

1. A male Negro, 18 to 19 years old, 5 feet 9 inches tall, 150 pounds, wearing a three-quarters dark coat, and tan hat.

2. A white male, age 18 to 19 years old, 5 feet 8 inches tall, 175 pounds, blond hair, light complexion, one-half dark leather jacket, blue jeans and referred to as Bruno.

3. A male Mexican, 15 to 16 years old, 5 feet 6 inches tall, 140 pounds, medium hair, dark, wearing a black quilted coat, with a gun.

4. A white male, 15 to 16 years old, 5 feet 5 inches tall, 145 pounds, wearing a white tee shirt, dark jacket and dark pants.

It was also stipulated that Neiddlac would testify that Matos said he had driven his car into an alley to relieve himself. As Matos started to get back into his car he was approached by four unknown men who pulled a .25-caliber automatic, took his wallet, and his keys and fled west through the alley.

*Donna Kramarczyk*

She is the sister of Bruno Kramarczyk. She was familiar with Robert Matos because she had dated him in 1968 for a period of about three months. At that time, he was known as Cheetah. Matos had been in her home on about 10 occasions and on about four of those he met her brother Bruno.

*Mary Rotto*

Mary Rotto testified that Joseph Lochirco was her grandson. She stated she had known Robert Matos prior to April 25, 1974. She had previously seen him and his friends on the street. On June 25, 1974, at 12:30 or 1 p.m., Matos drove up to their house and stopped in front. He got out of his car, took out a handgun and began yelling that he was going

to shoot her. Her grandson and her husband came through the gangway and Matos said he was going to kill "Fish" which was her grandson's nickname.

*Bruno Kramarczyk, on his own behalf*

At approximately 11 p.m. on the evening of April 25, 1974, he was sitting on the rear porch of the second house from the corner of 18th Place and Oakley. The porch faces the alley. He was sitting with his friend Eddie whom he had known for one week. He did not know Eddie's last name. At about 11:45 p.m. Matos drove into the alley, parked his car, and walked over to Kramarczyk and Eddie. Matos showed a badge and asked whether they had any drugs for sale. They told Matos that they did not know where he could buy any drugs. Matos left the proch and walked down the alley going east. When he heard loud screaming in the alley five minutes later, he "bent over the rail to take a look." There were about "ten guys" in the alley arguing about something. Five or ten minutes later he saw Matos run through the alley. He denied seeing Villalobos or Lochirco that night.

On cross-examination he stated that Matos dated his sister several years before the incident. He had also seen Matos playing ball in a park a year or two prior to the incident. Although he remained on the porch until about 12:05 a.m. he did not see any police officers in the alley. At the time of his arrest he told Marrello that he "was on a porch," but did not mention Eddie's name. He also stated that he told Marrello that he was in the alley that night.

*Maria Velez*

She was acquainted with the defendant Villalobos. She had a photograph of herself and Villalobos with a date of April 3, 1974, written on the back. She stated that in the photograph Villalobos was bald. She also testified she knew Robert Matos by the name of Cheetah and had known him since 1968. During the month of December 1973, she met Matos at a party while she was with Villalobos. As the result of her dancing with Matos, Villalobos became jealous. She noticed that Villalobos and Matos were arguing and she had asked Villalobos to take her home. On cross-examination she stated that she was a friend of both Lochirco and Kramarczyk.

Opinion

■■ Defendants first contend that the evidence adduced at trial failed to establish guilt beyond a reasonable doubt. Although we will reverse a criminal conviction where the record leaves us with a grave and substantial doubt of defendant's guilt (*People v. Willson* (1948), 401 Ill. 68, 81 N.E.2d 485), it clearly is "the function of the trier of fact to determine the credibility of the witnesses, the weight to be given to their

testimony and the inferences to be drawn from the evidence." (*People v. Akis* (1976), 63 Ill. 2d 296, 298, 347 N.E.2d 733, 734.) Where the evidence is irreconcilably conflicting the trier of fact must ascertain the truth (*People v. Hammond* (1970), 45 Ill. 2d 269, 259 N.E.2d 44), and in such a case we will not substitute our judgment for that of the trier of fact. *People v. Clark* (1964), 30 Ill. 2d 216, 195 N.E.2d 631.

In the instant case, the complaining witness, Robert Matos, positively identified defendants in court as his assailants. Moreover, prior to trial he made photographic identifications of all defendants and recognized both Villalobos and Lochirco in separate lineups. The record certainly indicates that Matos had sufficient opportunity to observe his assailants during the commission of the robbery. Our supreme court has repeatedly held that a positive identification by a single witness with ample opportunity to observe is sufficient to sustain a conviction (*People v. Clarke* (1971), 50 Ill. 2d 104, 277 N.E.2d 866; *People v. Williams* (1975), 60 Ill. 2d 1, 322 N.E.2d 819) even where that identification is contradicted by the accused. *People v. Yarbrough* (1977), 67 Ill. 2d 222, 367 N.E.2d 666. ■■ Defendants argue, however, in support of their reasonable doubt contention, that Matos' identification testimony was both weak and inconsistent. They refer first to the fact that Matos initially indicated that Lochirco and Kramarczyk had blonde hair, but admitted at trial that they had brown hair. We do not believe that such a discrepancy is of a substantial nature under the facts of this case. Considering the similarity of these colors, the traumatic nature of the encounter and the artificial lighting in the alley, such variation is not fatal to the State's case. Defendants refer also to Matos' failure to describe Villalobos as being bald on the date of the robbery. However, despite defendants' argument, the record does not establish that he was in fact bald on that date. Villalobos testified that he shaved his head in mid or late March 1974. This would have allowed approximately a month of hair growth prior to the date of the robbery. Considering the fact that Billalobos had black hair it does not seem unreasonable that some growth would be apparent to Matos.

Moreover, with regard to the alleged discrepancies in the identification, it is clear that discrepancies or omissions of detail by an identifying witness do not destroy the validity of the identification, but go instead to the weight of the testimony and are to be evaluated by the trier of fact. (*People v. Sanford* (1975), 34 Ill. App. 3d 485, 340 N.E.2d 255.) The test of a positive identification is whether the witness was close enough to the identified person for a sufficient time period under adequate conditions to observe and later make an identification. (*People v. Canale* (1972), 52 Ill. 2d 107, 285 N.E.2d 133.) As we have stated above,

Matos had ample opportunity to observe his assailants, and did, in fact, positively identify defendants both prior to and during the course of trial. ■ Defendants next argue in support of their reasonable doubt contention that certain aspects of Matos' testimony were absolutely incredible. They refer first to Matos' testimony that he drove into a dark alley to urinate even though he was only two miles from his home and a tavern, presumably containing a lavatory, was nearby. We do not agree with defendants that such actions are so contrary to human nature as to be incredible. Nor does the fact that Matos did not actually urinate until arriving home some 30 minutes after the robbery affect the credibility of his testimony. Defendants secondly refer to Matos' account of his escape from the alley. Matos testified that he made his escape by running past defendants to the west end of the alley rather than retreating eastward away from them. However, Matos explained that he was unfamiliar with the east end of the alley, but that he was aware of a tavern at the west end. We do not find this testimony to be incredible. A third aspect of Matos' testimony which defendants find incredible is his account of a subsequent meeting with an alleged eyewitness to the robbery. Matos testified that on the next day he was approached by an unidentified girl near the scene of the robbery. She gave Matos the nicknames of defendants, who she claimed were the robbers. Matos did not determine her name or address and did not see her again. He testified that he thereafter phoned the police station and gave both the nicknames and their source "to somebody over the phone." As defendants note, Marrello testified that Matos did not give this information to him. Again, we do not find Matos' testimony in this regard to be unbelievable. It is certainly understandable that such an eyewitness might not disclose her identity. Moreover, Matos did testify, contrary to defendants' assertion, that he gave the source of his information to the police. The fact that he did not go directly to Marrello does not render the testimony unbelievable.

■ Defendants further argue in support of their reasonable doubt contention that Matos' testimony was confused and inconsistent in several significant respects. Matos testified at trial that he was approached prior to exiting his car, while the police report indicated that he was approached after leaving the car. He also testified at trial that he was searched against the car while at the preliminary hearing he testified that he was searched after being walked 100 feet down the alley. Finally, at trial Matos testified that the lighting in the alley was good while at the preliminary hearing he testified that the lighting was medium. Defendants argue that these inconsistencies render Matos an incredible witness. We do not agree. Slight discrepancies do not destroy the credibility of an eyewitness, but go only to the weight of the testimony. (*People v. Willis*

(1970), 126 Ill. App. 2d 348, 261 N.E.2d 723; *People v. Gregory* (1976), 43 Ill. App. 3d 1052, 357 N.E.2d 1251.) It is for the trier of fact to determine what effect minor discrepancies have upon the witness' credibility. (*People v. Lemon* (1966), 70 Ill. App. 2d 413, 218 N.E.2d 8.) Moreover, contradictions between Matos' testimony and the information contained in the police report do not render the testimony incredible. (See *People v. Watkins* (1976), 44 Ill. App. 3d 73, 357 N.E.2d 1376.) The discrepancies complained of here are of minor nature and are inconsequential in light of Matos' positive identification of defendants both before and at trial. See *People v. Willis* (1970), 126 Ill. App. 2d 348, 261 N.E.2d 723.

■■ Defendants finally argue in support of their reasonable doubt contention that Matos' testimony was impeached where he stated that he did not know defendants prior to the robbery while defense witnesses testified that Matos had previously dated Kramarczyk's sister and had been acquainted with Villalobos. However, the trial court, as trier of fact, is not required to believe the testimony of defense witnesses. (See *People v. Lofton* (1977), 49 Ill. App. 3d 559, 364 N.E.2d 584.) We will not substitute our judgment for that of the trier of fact with regard to the credibility of witnesses. *People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733.

■■ After carefully reviewing the record, and having given our consideration to the arguments raised by defendants, we do not believe the trial court erred in finding Matos to be a credible witness. We are convinced that the evidence adduced at trial was sufficient to prove defendants' guilt beyond a reasonable doubt.

Defendant Kramarczyk individually contends that the trial court erred in failing to suppress his exculpatory statement to Marrello following his arrest. He argues that Marrello's warning failed to satisfy the requirements of *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. Kramarczyk testified that he was informed only that "anything you say may be held against you." Marrello testified that he did inform Kramarczyk of his "rights" as follows:

> "I informed him of his rights. I told him if he understood that he had a right to remain silent, asked him if he understood that if he didn't remain silent, anything he said could be used against him. I told him he had a right to have a lawyer and if he couldn't afford—."

At that point Marrello was apparently interrupted by the prosecutor and did not finish enumerating the rights. When asked about Kramarczyk's response to the warnings, Marrello testified: "I can't recall whether he said he knew that or if he nodded his head. It was an affirmative type answer."

■ We agree that the testimony of Marrello failed to establish that Kramarczyk was informed of his right to have an attorney with him during the interrogation and of his right to have an attorney provided if he could not afford one himself. (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.) While we do not condone the failure to give complete warnings, we do not believe the admission of Kramarczyk's statement to Marrello is reversible error here. Our supreme court has held where a defendant at trial admits in substance the matters contained in a statement given to the police, any error in admission of the post-arrest statement will be deemed cured or waived. (*People v. Auilar* (1974), 59 Ill. 2d 95, 319 N.E.2d 514.) Here, Kramarczyk took the witness stand at trial and substantially corroborated the testimony of Marrello regarding the exculpatory statement made following his arrest. We are convinced that, considering Kramarczyk's testimony at trial, the admission of his post-arrest statement could not have contributed to his conviction. Any error which may conceivably have occurred was therefore harmless beyond a reasonable doubt.

Defendant Kramarczyk also contends that the trial court erred in failing to suppress his post-arrest exculpatory statement on the grounds that his arrest was invalid. He raises the issue of whether a warrantless arrest in defendant's home without exigent circumstances violates the fourth amendment to the United States Constitution. Kramarczyk testified that he was approached in his backyard by two police officers on July 27, 1974. The officers asked him if he was "Bruno" and he replied affirmatively. He then told the officers that he had nothing to say to them, went into his home and locked the door. When the officers threatened to break down the door, Kramarczyk asked whether they had a warrant. Kramarczyk testified that the officers replied that he had been "watching too many detective movies." Kramarczyk then opened the door at his mother's urging in order to prevent any damage to the house. He was then placed under arrest.

In *People v. Wolgemuth* (1977), 69 Ill. 2d 154, 159, 370 N.E.2d 1067, 1069, our supreme court explained that, "the United States Supreme Court has consistently reserved judgment on the constitutionality of a warrantless entry into a home to make an arrest absent exigent circumstances." We had recent occasion to consider this question in *People v. Bean* (1979), 73 Ill. App. 3d 918, 392 N.E.2d 650, where we refused to hold that exigent circumstances are constitutionally required for a warrantless arrest in a private dwelling. We held in *Bean* that the law in this area must develop on a case by case basis. In determining whether the warrantless arrest was proper there we found it helpful to consider the factors suggested in *Dorman v. United States* (D.C. Cir. 1970), 435 F.2d

385. Those factors include consideration of whether (1) the offense is a grave one, particularly one of violence, (2) the suspect is reasonably believed to be armed, (3) there exists a clear and reliable showing of probable cause that the suspect committed the crime involved, (4) there is strong reason to believe the suspect is in the premises to be entered, (5) there is a likelihood the suspect may escape if not swiftly seized, (6) the entry is made peaceably or forcibly, and (7) the entry occurs during day or night.

■■ Based upon a consideration of the above factors, we believe the arrest here was valid. The officers had ample probable cause to believe Kramarczyk had committed a grave and violent crime. They were obviously aware of his presence in the house. Although the officers apparently threatened to use force, they did not do so. The officers, in fact, did not enter the home. Rather, Kramarczyk's mother prevailed upon him to come outside of his own volition. There was no invasion of an offensive nature here. Finally, the arrest here occurred during the day rather than during the night. Under these circumstances we do not believe the arrest here was in violation of the fourth amendment proscription against unreasonable searches and seizures.

Moreover, as we discussed earlier, at trial defendant Kramarczyk substantially corroborated his post-arrest exculpatory statement. Therefore, any possible error resulting from admission of the statement would be harmless and could not have contributed to Kramarczyk's conviction.

For the foregoing reasons the judgment of the circuit court is affirmed.

Affirmed.

SULLIVAN, P. J., and WILSON, J., concur.